Ref ✓

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------X
UNITED STATES OF AMERICA

           -against-

MICHAEL SPINELLI and
ROBERT SPINELLI,

                    Defendants.
------------------------------------------------X

**MEMORANDUM OF DECISION**

97 CR 209

DEARIE, Chief Judge.

      This case marks an extraordinary low point in the violent history of organized crime. Michael and Robert Spinelli stand convicted of conspiracy to murder, assault with a dangerous weapon, and conspiracy to tamper with a witness for their actions in connection with the Luchese crime family's uniquely vicious effort to silence Peter Chiodo, a former Luchese captain who became a cooperating government witness. Following Chiodo's arrest for his involvement in bid-rigging and labor racketeering in the window replacement industry in New York City (the "Windows" conspiracy), the Luchese family mistakenly believed that he had turned on them. In May 1991, they attempted to murder him, and although he was shot thirteen times, he survived. In fact, Chiodo began assisting the government only after the attempted hit. Most members of Chiodo's family were placed in the federal Witness Protection Program, but his sister Patricia Capozzalo and her family declined relocation.

      In the fall of 1991, Chiodo testified as a government witness at the Windows trial. He was expected to testify at additional trials, including that of Luchese family boss Vittorio Amuso, in the spring of 1992. Desperate to stop Chiodo, the Luchese family planned to murder his sister. Luchese family member Michael Spinelli, who was responsible for carrying out the murder, enlisted the help of Dino Basciano, Jody Calabrese, and Gregory Cappello, as well as his brother

Robert Spinelli. After aborting two planned attempts, the conspirators attacked Patricia Capozzalo on the morning of March 10, 1992, as she returned from driving one of her children to the school bus stop. As Capozzalo parked in front of her home, Michael Spinelli and Dino Basciano pulled up in a van. Basciano stepped out, walked over to the driver's side of her car, and shot several times through the window. Robert Spinelli waited close by in a "switch" car to drive Michael and Basciano away from the scene. Although Capozzalo was struck by two bullets, including one that lodged in her neck, she survived the unprecedented attack.

Just after defendants were sentenced for their participation in the plot to murder Capozzalo, former Luchese family member Frank Gioia, one of the government's witnesses against defendants, testified in an unrelated state trial. As a result of that testimony, the prosecutors in this case became aware that for a two-year period after he began cooperating with federal authorities, Gioia failed to disclose information about the unrelated criminal activities of his former fiancée's family members. The prosecutors immediately notified defense counsel. Defendants moved for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure, claiming that this newly discovered evidence, as well his testimony at the state trial that he had considered avenging the murder of his former fiancée's father at her brother's request, warranted a new trial. Defendants also contended that Gioia perjured himself at their trial by failing to acknowledge this breach of his cooperation agreement. By endorsed order dated January 7, 2002, the Court denied defendants' motions. The reasons follow.

**Background**

For the attempt on Capozzalo's life, Michael and Robert Spinelli were charged under the Racketeer Influenced and Corrupt Organizations Act with conspiracy to murder, assault, and conspiracy to tamper with a witness. In addition, Michael Spinelli was charged with two firearms violations. Trial began on October 26, 1998. The government's principal witness was Basciano. He testified for nearly two full days, and his testimony spans over 450 pages of the trial transcript. Basciano recounted how he came to know Michael and Robert Spinelli, and admitted that they engaged in large-scale distributions of marijuana. He testified in detail about the murder conspiracy that began when he received a call from Michael Spinelli asking if he was ready to do some "work." Michael and Basciano discussed that Capozzalo's murder would send a message to Chiodo to stop talking. They drove to Capozzalo's home a number of times, first to plan their attack and exit strategy, and then to confirm her morning routine and run through the plan. Basciano secured a .38 caliber gun with a silencer and a van; Robert provided a stolen getaway car. Basciano explained that Michael test-fired the gun with the silencer, shooting a bullet into the wall of his apartment. Michael insisted that Basciano be the shooter because he feared that Capozzalo would recognize him. Basciano described the specifics of the two attempts that were interrupted by neighbors coming out of their homes and the final attack. A piece of wall taken from Michael's apartment bore a hole consistent with a .38 caliber bullet.

Frank Gioia testified about conversations he had with defendants prior to their indictment, including conversations that took place in 1994 when the three were in prison together. During those conversations, Gioia explained, Michael discussed the details of the Capozzalo murder attempt and the reasons for it, and both Michael and Robert expressed their

3

concern that they would be indicted. Gioia's testimony was corroborated by prison records.

Defendants were convicted on all counts. In June 1999, Michael Spinelli was sentenced to twenty-four and one-half years in prison, and in July 1999, Robert Spinelli was sentenced to ten years in prison.

Shortly after the Spinelli trial, on September 22, 1999, Gioia testified as a prosecution witness in New York v. Anthony Francesehi, an unrelated state trial concerning the murder of New York City police officer Ronald Stapleton. At the Francesehi trial, Gioia admitted that for over two years after beginning his cooperation with the federal government, he did not disclose information about Francesehi's crimes and about crimes committed by other relatives of Gioia's former fiancée Kim Smith. He explained that he had withheld the information because he did not want to jeopardize his relationship with the child he had with Smith. Gioia decided to disclose the information, he said, only after learning that Smith had recorded his telephone conversations with her from prison. In addition, Gioia testified that at the request of Frank Smith, Jr., Kim Smith's brother, he had sought permission from his boss to murder Joe Izzo, the suspected killer of Frank Smith, Jr.'s father. The planning of the Izzo murder was cut short by Gioia's arrest.

Prior to Gioia's admissions at the Francesehi trial, the prosecutors in Spinelli were not aware that Gioia had withheld information about crimes committed by Francesehi and other members of Kim Smith's family. The information Gioia ultimately provided about those individuals at his July 1997 proffer session was recorded in FBI 302 reports (the "Smith 302's") and was in the prosecutors' possession by the fall of 1998, prior to defendants' trial. The government disclosed to the defense considerable impeachment material reflecting Gioia's life of

4

crime. (Gov't's Mem. at 5). However, the Smith 302's were not disclosed to the Spinelli defense because they did not relate to criminal activity of either Gioia or defendants. Later, the prosecutors learned that Gioia hoped that the government might move for a reduced sentence on his behalf as a result of his assistance in the Stapleton state murder case, making the Smith 302 relating to the Stapleton murder arguably subject to disclosure under Brady v. Maryland, 373 U.S. 83 (1963) and Giglio v. United States, 405 U.S. 150 (1972). But, because the Stapleton murder investigation was ongoing, on October 21, 1998, the prosecutors sought an ex parte order permitting them to withhold the relevant Smith 302 and any information concerning the Francesehi investigation. The Court granted the application. In addition, although Gioia disclosed information regarding the nascent Izzo murder conspiracy in a June 1995 debriefing, that information was never memorialized in an FBI 302. The handwritten notes containing the information were not turned over to the Spinelli defense because the Assistant United States Attorneys assigned to the Spinelli case were unaware that any notes existed containing information not replicated in the FBI 302's.

Immediately after Gioia testified in the Francesehi trial, by letter dated October 13, 1999, the government advised Spinelli defense counsel that Gioia had withheld information for two years regarding the criminal activity of Smith's relatives. On February 4, 2000, the government supplied defendants with a detailed account of the information Gioia had provided as well as additional information he had provided in 1999 about a crime that he had failed to remember earlier. The government also supplied a redacted copy of the Smith 302 memorializing the information regarding Francesehi's murder of Stapleton and the October 21, 1998 ex parte application to the Court.

Michael Spinelli, joined by Robert Spinelli, sought a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. Defendants argued that Gioia's breach of his cooperation agreement and his participation in the aborted Izzo murder conspiracy constituted material new impeachment evidence warranting a new trial. Further, they contended that they were entitled to relief because Gioia had perjured himself by failing to admit this violation of his cooperation agreement and to planning with Frank Smith, Jr. to murder Izzo.

Defendants' brief is filled with innuendo and hyperbole with respect to the manner in which the Assistant United States Attorneys dealt with their disclosure obligations that is simply not supported by a fair reading of the record. It is apparent that the government took its obligations seriously as evidenced by its extensive pre-trial disclosures of Gioia's impressive criminal pedigree, by its ex parte disclosure of the relevant Smith 302 to this Court, and by its prompt notification to defendants after the Francesehi trial of Gioia's delay in proffering information.

Nevertheless, the government concedes that because of the circumstances surrounding Gioia's July 1997 proffer, it should have known that Gioia withheld information and that defendants should have been informed of the late disclosure because of its potential impeachment value. The government also acknowledges that the handwritten notes containing information about the plan to murder Izzo should have been produced. The government argues that a new trial is not warranted, however, because the undisclosed evidence is not material and is cumulative. The Court agrees.

## Discussion

Motions pursuant to Rule 33 of the Federal Rules of Criminal Procedure for a new trial based on newly discovered evidence are "ordinarily 'not favored and should be granted only with great caution.'" United States v. Wong, 78 F.3d 73, 79 (2d Cir. 1996) (quoting United States v. Stofsky, 527 F.2d 237, 243 (2d Cir. 1975)); see also United States v. Gambino, 59 F.3d 353, 364 (2d Cir. 1995) (Rule 33 motion disfavored in this Circuit). A district court must exercise its discretion to grant a new trial "sparingly" and only "in the most extraordinary circumstances." United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992).

Generally, Rule 33 relief is warranted only if the defendant demonstrates that "the evidence is so material and non-cumulative that its admission 'would probably lead to an acquittal.'" United States v. Owen, 500 F.3d 83, 2007 WL 2472019, at *4 (2d Cir. 2007) (quoting United States v. Alessi, 638 F.2d 466, 479 (2d Cir. 1980)); see also United States v. Zagari, 111 F.3d 307, 322 (2d Cir. 1997). The standard differs, however, when the government has failed to disclose evidence favorable to the defense. Constitutional error occurs "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Kyles v. Whitley, 514 U.S. 419, 433-34 (1995) (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)). In such a case,

> [t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

Id. at 434 (quoting Bagley, 473 U.S. at 678).

7

Similarly, where perjured testimony has been introduced at trial, a new trial is required only if "the testimony was material and 'the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.'" United States v. Wallach, 935 F.2d 445, 456 (2d Cir. 1991) (quoting Sanders v. Sullivan, 863 F.2d 218, 226 (2d Cir. 1988)). As a threshold matter, the defendant must demonstrate that perjury was in fact committed. See United States v. Torres, 128 F.3d 38, 49 (2d Cir. 1997); United States v. Moore, 54 F.3d 92, 99 (2d Cir. 1995); United States v. White, 972 F. 2d 16, 20 (2d Cir. 1992). The materiality standard is reduced, however, if the prosecution knew or should have known of the perjury. Wallach, 935 F.2d at 456. In such a case, a new trial is required "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." Id. (internal quotation marks and citations omitted).

Impeachment evidence is material "if the witness whose testimony is attacked 'supplied the only evidence linking defendant(s) to the crime,'" Wong, 78 F.3d at 79 (quoting United States v. Petrillo, 821 F.2d 85, 90 (2d Cir. 1987)), or "where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case," id. (quoting United States v. Payne, 63 F.3d 1200, 1210 (2d Cir. 1995)); see also United States v. Avellino, 136 F.3d 249, 256-57 (2d Cir. 1998) (impeachment evidence considered material where witness supplied only evidence linking defendant to crime or where witness supplied only evidence of essential element of offense). Although defendants describe Gioia as a "star witness," "indispensable," and one of "two principal trial witnesses," (Def.'s Mem. at 2-4), these characterizations do not come close to accurately describing his role at trial. Gioia supplied neither the most significant evidence linking defendants to the crime nor the only evidence of an

8

essential element of the offense. Indeed, Basciano, the shooter, testified to the specifics of the murder conspiracy, the two prior attempts on Capozzalo, and the details of the ultimate attack. Gioia's testimony supplied corroboration of Basciano's account. However, contrary to defendants' contention, Gioia's credibility simply was not "the most significant factual issue for the jury's consideration in reaching its verdict." (Def.'s Mem. at 29). Rather, Basciano's testimony alone provided abundant evidence against defendants on all counts.

Moreover, evidence that is cumulative is not material. "[W]hen the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable," a new trial is not warranted. Wong, 78 F.3d at 79 (quoting Payne, 63 F.3d at 1210); see also Avellino, 136 F.3d at 257 ("[W]here the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material."); Gambino, 59 F.3d at 366 ("Nondisclosure of cumulative evidence tending only to further impeach a witness' general credibility is not grounds for granting a Rule 33 motion."); United States v. Locascio, 6 F.3d 924, 949 (2d Cir. 1993) (The "addition of a few more allegations would not have materially affected the defense's cross examination" where the witness "had already confessed to numerous crimes, including murders, and was subject to withering cross examination for those actions."). Gioia's credibility was vigorously attacked at trial, an easy task because of his lifetime of crime. As this Court noted, he was subject to examination with respect to "a virtual encyclopedia of criminal activities of the worst sort." (Tr. 1848). Gioia also testified and was cross-examined about a number of other violations of his

9

cooperation agreement. The additional impeachment evidence cannot "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Wong, 78 F.3d at 79 (quoting Kyles, 514 U.S. at 435). Even if the undisclosed impeachment material had been used by the defense to its greatest advantage, it merely would have evidenced what was already apparent—that Gioia was a dangerous career criminal whose testimony required close scrutiny, as the jury was instructed. Further, it is not at all clear that Gioia's explanation for his tardy disclosure would have negatively impacted his credibility. Gioia's reason for delaying disclosure of the Smith family's criminal activities to the government—to safeguard his relationship with his child—could have made him appear to a limited extent worthy of the jury's sympathy and trust.

Finally, although the government neither concedes that Gioia committed perjury nor concedes that it knew or should have known of the perjury, the alleged perjury is not material even under the reduced standard. Gioia's testimony was corroborative of Basciano's detailed, first-hand account of the planning and execution of the attack on Capozzalo, and his alleged perjury did not relate to the substance of his testimony against defendants. Moreover, his credibility was aggressively challenged by the defense. Although

> new impeachment evidence may satisfy the 'reasonable likelihood' standard where a conviction depends on the testimony of a single government witness, or on a witness whose credibility was not attacked on cross-examination[,] . . . where independent evidence supports a defendant's conviction, the subsequent discovery that a witness's testimony at trial was perjured will not warrant a new trial.

Wong, 78 F.3d at 82 (citations omitted). There is no "reasonable likelihood" that Gioia's perjury could have affected the judgment of the jury. Because a new trial is not warranted even applying

10

this standard, an evidentiary hearing to determine whether the government knew or should have known of Gioia's perjury is unnecessary. See United States v. Stewart, 433 F.3d 273, 302 (2d Cir. 2006) (no need for hearing to probe extent of government awareness where perjury not sufficiently material to undermine confidence in verdict); White, 972 F.2d at 22 (district court does not abuse its discretion by not conducting hearing where it is unnecessary to resolve issues that would be hearing's focus). In the end, the essential question remains. Is there any reasonable likelihood that more timely disclosures would have made a difference in the outcome of the trial? The answer is a resounding no.

## Conclusion

For the foregoing reasons, defendants' motions were denied. The interests of justice and a fair and sensible resolution of this motion require that the verdicts, supported by compelling evidence, not be disturbed.


Dated: Brooklyn, New York
      October 30, 2007                      s/ Judge Raymond J. Dearie

                                                    RAYMOND J. DEARIE
                                                    United States District Judge